(R.D. 11685)

PACIFIC CUSTOMS BROKERAGE Co. *v.* UNITED STATES

Entry No. 23070, etc.

(Decided December 5, 1969)

*John C. Ray* for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Glenn E. Harris, Brian Goldstein*, and *Robert Blanc*, trial attorneys), for the defendant.

RICHARDSON, Judge: The merchandise of these reappraisement appeals consists of birch veneer which was exported from Canada, entered at Detroit, Michigan, and advanced in value upon appraisement under the export value basis as defined in 19 U.S.C.A., section

1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at invoice unit prices in U.S. dollars, less 2 per cent discount packed. It is claimed by the plaintiff that an additional 5 per cent of the invoice prices, derived from an agreed upon rate of exchange of currency (Canadian dollars against United States dollars utilized by the parties to the involved import transactions), should have been allowed in the appraisements returned herein under the export value basis.

Although much of the testimony presented at the trial and given under interrogatories and cross-interrogatories by persons connected with the importer and exporter firms, respectively, dealt with the nature of the imported product, the method of its manufacture, and the uses to which the product is put, the propriety of the allowance of the said 5 per cent exchange settlement appears to be the only issue in the case—an issue not requiring, in the court's opinion, a discussion of such subject matter. The court deems it appropriate to note in this connection only the fact, established in the evidence, that the exporter firm, Albert Gigaire Ltee, of Shawinigan, Quebec, Canada, appears to have been the only Canadian firm producing at the time here involved the "random widths" veneer comprising the bulk of the shipments at bar, and the further fact that this type of veneer was sold by the Canadian producer to the importer, Ben Pivnick Plywood & Veneer Company of Farmington, Michigan, and others for exportation to the United States.

With respect to the terms underlying the export transactions at bar, Ben Pivnick, the importer's president, testified on direct examination (R. 35–36) :

By Mr. Ray:

Q. Now, on what bases were you purchasing veneer in 99 inch lengths sound and better at random widths from Gigaire during the period which is before the court this morning, namely October 1962 to June 1963?—A. I was buying it at quoted prices at Canadian funds.

\*     \*     \*     \*     \*     \*     \*

The Witness: I was purchasing this material at the quoted price in Canadian funds. However, we had fixed the exchange on Canadian funds at 95 per cent. In other words, that it should go to no lower than 95 per cent of the American dollar and in addition, I received 2 per cent cash discount for payment in 10 days from date of invoice.

And on the same subject Jean Paul Gignac, former general manager and secretary-treasurer of Albert Gigaire Ltee, testified upon interrogatories (R. 88–90, 96) :

Interrogatory No. 16:
On what basis did you sell veneer in Canada during the period from October, 1962 to June, 1963? For export to the United States during the same period?

    \*       \*       \*       \*       \*       \*       \*

Question: Mode of payment?
Answer: Well, the basis, I guess what he wants to know. We were selling most of our veneer to . . . on Canadian funds basis, two per cent (2%) discount after ten (10) days. That must be the answer he wants, but it occurred . . . that is for Canada—for export to the United States, generally speaking, we were selling on the same terms as for Canada, that is Canadian funds, two per cent (2%) discount after ten (10) days, but it occurred once in a while, especially at that time, that we were selling some of that veneer in U.S. funds.

Interrogatory No. 17:
On what basis were you selling the said Pivnick Co. veneer in 1962 and up to June 1963? If there was any difference in the terms of sale to Pivnick Co. than to others, please explain the reason for the difference.

Answer: Well, we were selling Pivnick Company in Canadian dollars with a discount of two per cent (2%) after ten (10 days . . . err . . . two per cent (2%) ten days. There could have been some difference in the terms of sale to Pivnick company and the others, mainly because Pivnick was by far our biggest client. He still is, and we were trying then to make arrangements with him that were . . . that would last more than a week or a month, in order to give him some liberty to make for himself long term arrangements with some of his clients.

    \*       \*       \*       \*       \*       \*       \*

Interrogatory No. 20:
Were any other customers of yours in the United States during the period of October, 1962 to June, 1963 given the same terms of settlement as Pivnick Co.? Please explain.

Answer: I do not think that our other customers were given exactly the same terms than [sic] Pivnick in the period of October nineteen sixty-two (1962) to June nineteen sixty-three (1963). During that period we sold some veneers to other customers and some of them, most of them, we invoiced in U.S. funds.

Additional testimony elicited from the witness Gignac corroborated the testimony of the witness Pivnick relative to the existence of the pegging arrangement between the exporter and importer for conversion of Canadian dollars into United States dollars. And attached to the cross-interrogatories propounded of the witness Gignac were 22 copies of invoices covering birch veneer export transactions between Gigaire and five other United States importers during the period here involved. Of these invoices 18 call for payment in U.S. funds, and 4 call for payment in Canadian funds. None of the invoices calling for

payment in Canadian funds provide for any exchange rate adjustments between Canadian and United States dollars.

The foregoing constitutes the pertinent evidence bearing on the issue before the court. Section 1401a(b) states:

### Export value

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold, or in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and *in the ordinary course of trade*, for exportation to the United States, plus when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States. [Emphasis added.]

Plaintiff cites a number of cases in support of its position on the exchange settlement, the most pertinent of which the court finds to be the case of *United States* v. *Enrique Vidal Sanchez*, 15 Ct. Cust Appls. 443, T.D. 42642 (1928), involving the export value of cast-iron pipe and fittings exported from Belgium and entered at San Juan, Puerto Rico. In that case the entered, appraised, and reappraised values of the merchandise included, among other things, a 6 per cent charge for insurance against fluctuation of the exchange rate of Belgian francs against the United States dollar. The appellate term of the Customs Court modified the reappraised values by disallowing this particular charge, among other items. And in affirming the appellate term in this regard the Court of Customs Appeals stated (pages 450-451):

The exporter estimated, as a part of his contract price, 6 per centum for insurance against losses in exchange, and this, the Government claims, is a part of the export value. It appears from the record, however, that the ordinary practice of the exporter is to sell in terms of the currency of Belgium and not in American dollars. At the time the contract was made, the importer insisted upon a contract price in dollars. The rate of exchange at that time was 22.07 Belgian francs to the dollar, but it was expected that, owing to the rehabilitation of the finances of Belgium, the value of the Belgian franc would thereafter, and during the life of the contract, rise, and the value of the exporter's American dollars, received on the contract, would become less. To insure against this, the Belgian company added 6 per cent to its delivery price. . . .

\* \* \* \* \* \* \*

To sum up, the three items last above discussed are not such as, "in the ordinary course of trade," constitute a part of the export price of the goods in question. Each and all of them were occa-

sioned by the unusual and extraordinary requirements of the importer. If he had been content to buy his goods as such goods were ordinarily sold for export such additional charges would not have been made. They were not a part of the ordinary export value, and hence cannot be deemed dutiable.

Section 402(c) of the Tariff Act of 1922, which was before the appeals court in the *Sanchez* case, also contained the phrase "in the ordinary course of trade" which is part of section 1401a(b) before this court, in connection with statutory export value.

The holding of our appeals court in the *Sanchez* case establishes that in order for an exchange settlement in a particular import transaction to govern statutory export value of merchandise affected thereby the settlement must reflect the ordinary course of trade in the country of exportation in such matters. In the instant case the evidence indicates that most of the United States export transactions contemporaneous to those at bar were consummated in United States dollars, and that of the five export transactions consummated during this period in Canadian dollars only the transaction at bar was accorded the particular exchange settlement here involved. And the reason given for this was that the settlement was for the exporter's benefit as a hedge against anticipated depreciation of the Canadian dollar against the United States dollar, owing to the fact that the importer was and is the exporter's biggest customer in the United States.

In the light of such evidence, it is clear that the exchange settlement reflected on the invoices at bar represents special treatment for a special kind of situation obtaining only with respect to the importer herein. As such, the exchange settlement accorded the importer cannot operate to influence export value as it does not reflect a practice which was within the ordinary course of trade in Canada during the time in question. It follows, therefore, that the appraiser did not err in disregarding the exchange settlement shown on the invoices covered by the entries at bar in arriving at an export value determination for the merchandise herein.

In view of the foregoing, the court finds as facts:

1. That the merchandise covered by the reappraisement appeals herein consists of birch veneer exported from Canada at various times between October, 1962, and June, 1963, and entered at Detroit, Michigan.

2. That said merchandise was appraised on the basis of export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at invoice unit prices in United States dollars, less 2 per cent discount, packed.

3. That plaintiff has failed to prove that an exchange settlement involving Canadian dollars against United States dollars in the ratio of 95 per cent and affecting the said merchandise conformed to the ordinary course of trade in Canada during the period between October, 1962 and June, 1963.

Upon these facts, the court concludes as matters of law:

1. That plaintiff has failed to rebut the presumption of correctness attaching to the appraisement of the merchandise covered by the reappraisement appeals herein.

2. That export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of said merchandise.

3. That such values are the appraised values.

Judgment will be entered accordingly.